DANIEL M. KELLY ET AL. *v.* WILLIAM M. IVLER ET AL.

SPEZIALE, C. J., HEALEY, PARSKEY, ARMENTANO and SHEA, Js.

Argued February 10—decision released May 4, 1982

*William M. Ivler,* for the appellants-appellees (defendants).

*James F. Simon,* with whom, on the brief, was *Franklin Melzer,* for the appellees-appellants (plaintiffs).

ARTHUR H. HEALEY, J.  This matter arises out of a dispute over the use of and interference with certain easements existing across both parties' properties in Stamford.  The plaintiffs brought an action seeking damages and an injunction in an attempt to force the defendants to remove certain improvements from an easement which runs across the southerly portion of the defendants' property and to enjoin them from interfering with their use of that easement.  The defendants counterclaimed and alleged that the plaintiffs had no easement across the defendants' property and also that the plaintiffs have interfered with easements of the defendants which run across the westerly and southerly portions of the plaintiffs' property.  The trial court found certain issues for both parties from which the defendants appealed and the plaintiffs cross appealed.

The plaintiffs are owners of two parcels of land, each with a house situated thereon, located in the Shippan area of Stamford.  (See Appendix.)  Each parcel fronts on a 29.58 foot strip of land, owned in fee by the plaintiffs, which extends northerly from Ocean Drive East and which has been designated as the "right of way."  The parties and the trial court have designated these parcels as Lots 1 and 2 with Lot 1 being to the north of Lot 2.  Directly to the east of Lot 1 and abutting the same is another lot with a house situated thereon, designated as Lot 3, which the defendants own.  Lot 3 is bounded on the east by Long Island Sound.

Neither of the plaintiffs' properties has any direct access to Long Island Sound. The plaintiffs do, however, claim an easement, reserved in a deed by a predecessor in title, of six feet in width along the southerly boundary of the defendants' Lot 3 to the waters of Long Island Sound (hereinafter "the Long Island Sound easement").

The defendants, on the other hand, have no direct access to Ocean Drive East or to the plaintiffs' 29.58 foot right of way which extends to its north. The plaintiffs concede, however, that the defendants' access to Ocean Drive East is by way of the 29.58 foot right of way described above. Also conceded is the fact that access to the defendants' property from the 29.58 foot right of way is by way of an easement, nine feet in width, running from west to east along the southerly boundary of the plaintiffs' Lot 2 ("the nine foot easement") and by another connecting easement, six feet in width, running from south to north along the easterly boundary of the same lot ("the six foot easement"). Both parties agree that the six foot and nine foot easements, as they exist today, are represented by a driveway leading from Ocean Drive East to the defendants' house on Lot 3. Additionally, the defendants have title to a parking space located within the 29.58 foot right of way, the use of which is in dispute, as well as the right to park other vehicles within the right of way.

The defendants have erected a fence along the southerly boundary of their property allegedly encroaching upon the plaintiffs' Long Island Sound easement. The defendants have installed a catch basin at the westerly boundary of that easement and, in the process, removed a step from a stone

stairway which had previously existed. The defendants also installed drainage pipes which empty into that easement thereby changing the flow of surface water on their property. This has caused excess water to flow into the Long Island Sound easement greatly increasing the erosion thereon. Within the nine and six foot easements, the defendants have installed, and the plaintiffs have removed, mushroom-type lights, apparently to make the driveway safer for nighttime travel. The plaintiffs, meanwhile, have built a speed bump in the nine foot easement and have placed cement blocks along the perimeter of the defendants' parking space located in the 29.58 foot right of way.

The trial court held that the plaintiffs had established that the Long Island Sound easement was reserved in a deed by a predecessor in title and that it was permanent and ran with the land in favor of the plaintiffs' properties.[1] The court ordered the removal of the drainage pipes which emptied into that easement because they interfered with and impaired the plaintiffs' use of that easement. The court also ordered the defendants to pay $500 in damages to the plaintiffs to cover the cost of the damages sustained in the Long Island Sound easement. The court additionally found, however, that the defendants' fence was only a slight encroachment which did not interfere with the plaintiffs' use of the Long Island Sound easement. As to the six and nine foot easements, the court found that the installed lighting was consistent with the use of the easements and that the speed bump was a nuisance and must be removed.

---

[1] The plaintiffs also contended that they had established an easement by estoppel and by prescriptive use. The trial court, however, made no determination of either of these claims.

The court also found that the plaintiffs' placing of cement blocks along the perimeter of the defendants' parking space interfered with the defendants' ingress and egress from their vehicle and ordered them removed. Finally, apparently in response to a matter which was raised at trial, the court stated that "[a]s to the plaintiffs' use of the land between the mean high and mean low water marks, there can be no dispute. See *Conn.* v. *Knowles-Lombard Co.*, 122 Conn. 263, 265 [188 A. 275 (1936)]."

The defendants have appealed and claim that the court erred (1) in holding that the plaintiffs have a permanent easement by reservation to Long Island Sound across their property, and (2) in holding that the plaintiffs were entitled to $500 in damages. The plaintiffs have cross appealed and claim that the court erred (1) in holding that the defendants' fence does not interfere with the plaintiffs' use of the Long Island Sound easement; (2) in ordering the plaintiffs to remove the cement blocks from the perimeter of the defendants' parking space within the 29.58 foot right of way; and (3) in not expressly stating that the defendants could not exclude the plaintiffs from using the beach area between the mean high and mean low water marks because said area belongs to the public. We will first address the defendants' claims of error.

I

To comprehend fully the defendants' first argument, a brief history of these pieces of property must be set out. Prior to 1916, Theodore V. Ketcham owned each of the three parcels of land now belonging to the parties along with a fourth parcel (Lot 4) which is directly to the south of the

defendants' property and which also has the Long Island Sound as its easterly border. In 1916, Theodore conveyed Lot 1 to his son, Stuart Ketcham, while retaining Lots 2, 3 and 4. In 1929, Theodore simultaneously conveyed Lot 2 to Stuart and Lot 3 to his daughter, Marion MacKenzie. At the same time, Marion conveyed to Stuart, by quitclaim deed from the land about to be conveyed to her, the easement leading to Long Island Sound. The quitclaim deed described the boundaries and location of the easement and also provided: "Said right of way is granted for the benefit of any [sic] appurtenant to any and all portions of the land about to be conveyed to the grantee [Stuart] by Theodore V. Ketcham and the land [Lot 1] now owned by the grantee lying to the north of the land so to be conveyed to the grantee by the said Theodore V. Ketcham.

"To have and to hold the premises, with all the privileges and appurtenances, unto said releasee [Stuart] his heirs and assigns forever, so that neither I [Marion] the said releasor nor my heirs, nor any person under me or them shall hereafter have any claim, right or title in or to the premises, or any part thereof, but therefrom I am and they are by these presents forever barred and secluded except my fee simple ownership thereof." The defendants have conceded, and correctly so, that this 1929 deed created and granted a permanent easement (i.e., "the Long Island Sound easement") to the owners of Lots 1 and 2.

The situation remained unchanged until 1953 when two transactions occurred. On April 24, Stuart quitclaimed his interest in Lot 3 for one dollar to Marion. One minute later, Marion con-

veyed her entire interest in Lot 3 to Orestes LaPolla by warranty deed.[2] In the April 24, 1953 quitclaim deed from Stuart to Marion, the following appeared: "reserving, however, to me the said releasor [Stuart] as appurtenant to my other land shown on said map a right of way and easement of use for any and all purposes in, over, and upon a strip of land six (6) feet in width designated as 'Right of Way' . . . and lying along the southerly boundary line of [Lot 3]." The resolution of this first issue turns on the interpretation accorded to this reservation clause. The plaintiffs became the owners of Lot 1 in 1959 and of Lot 2 in 1960. The defendants became the owners of Lot 3 in 1976 after the property had changed hands twice in the interim.[3] Stuart died in 1955.

The defendants claim that the above quoted language from the 1953 quitclaim deed operated to convert the undisputed permanent Long Island Sound easement, granted in the 1929 deed, into a mere personal right of way in Stuart which terminated with his death in 1955. The defendants point out that since there were no words of limitation such as "to my heirs and assigns," the easement reserved was personal to the grantor and, therefore, the plaintiffs have no right to use the Long Island Sound easement running along the southerly portion of the defendants' property. Additionally,

[2] The warranty deed from Marion MacKenzie to Orestes LaPolla referred to the Long Island Sound easement over Lot 3 as follows: "Said premises are conveyed subject to . . . an easement of way and use over the southerly six (6) feet of said premises, as shown on said map." The map referred to was an exhibit before the trial court and the original was on file in the office of the town clerk of Stamford.

[3] In 1970 the LaPollas transferred the property to the Normans; in 1974 the Normans sold to the Packards and in 1976 the Packards sold to the defendants.

the defendants allege that the "surrounding circumstances" existing at the time the 1953 deed was executed do not demonstrate an intention to create anything other than a reservation of a personal right of way. The trial court rejected these arguments and found this issue for the plaintiffs and we affirm that decision.

Since the defendants have conceded that the 1929 quitclaim deed from Marion to Stuart created a permanent appurtenant easement in the owners of Lots 1 and 2, the major focus of this issue becomes whether the reservation clause contained in the 1953 deed from Stuart to Marion reduced the appurtenant easement to an easement in gross. "The meaning and effect of the reservation are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances; *Knowlton* v. *New York, N.H. & H. R. Co.,* 72 Conn. 188, 192, 44 A. 8 [1899]; *Lewis Oyster Co.* v. *West,* 93 Conn. 518, 523, 107 A. 138 [1919]; *Ferrigno* v. *Odell,* 113 Conn. 420, 424, 155 A. 639 [1931]; *Patzloff* v. *Kasperovich,* 116 Conn. 440, 441, 165 A. 349 [1933]; and its interpretation presented a question of law. *Mills* v. *Roto Co.,* 104 Conn. 645, 647, 133 A. 913 [1926]; *Margolis* v. *Wise,* 91 Conn. 152, 156, 99 A. 511 [1916]." *Taylor* v. *Dennehy,* 136 Conn. 398, 402, 71 A.2d 596 (1950); see 25 Am. Jur. 2d, Easements and Licenses § 13.

It is well settled that "[i]f the easement makes no mention of the heirs and assigns of the grantee, a presumption is created that the intent of the parties was that merely a personal right of way was reserved. This presumption, however, is not con-

clusive. A reservation will be interpreted as creating a permanent easement if, from all the surrounding circumstances, it appears that that was the intention of the parties. *Dunn Bros., Inc.* v. *Lesnewsky,* 164 Conn. 331, 335, 321 A.2d 453 (1973); *Birdsey* v. *Kosienski,* [140 Conn. 403, 410, 101 A.2d 274 (1953)]." *Leabo* v. *Leninski,* 182 Conn. 611, 614, 438 A.2d 1153 (1981); see *Birdsey* v. *Kosienski,* supra; *Taylor* v. *Dennehy,* supra; *Kowalski* v. *Mather,* 112 Conn. 594, 595, 153 A. 168 (1931); *Knowlton* v. *New York, N.H. & H. R. Co.,* supra; *Chappel* v. *New York, N.H. & H. R. Co.,* 62 Conn. 195, 203, 24 A. 997 (1892). Since the 1953 reservation clause does not contain words of limitation, i.e., heirs and assigns, we would ordinarily presume that a mere easement in gross was reserved thereby supporting the defendants' argument.[4] When the "surrounding circumstances" are examined, however, it is apparent that the intentions of Stuart and Marion were to reserve a permanent easement.

The defendants argue that the surrounding circumstances point in just the opposite way. They state that if "the intent of Stuart (and Marion) . . . in 1953 were to continue the permanent easement as 'appurtenant' to [Lots] 1 and 2 . . . *there was no need to have Stuart execute any further document at the time of Marion's sale in 1953 or to have it recorded immediately prior to the recorda-*

---

[4] In *Birdsey* v. *Kosienski,* 140 Conn. 403, 410, 101 A.2d 274 (1953), in referring to *Taylor* v. *Dennehy,* 136 Conn. 398, 402, 71 A.2d 596 (1950), and *Kowalski* v. *Mather,* 112 Conn. 594, 595, 153 A. 168 (1931), in support of this proposition, we did say as to *Taylor* and *Kowalski:* "Both cases cited, however, recognize that the presumption created by the omission of the words of inheritance is not conclusive."

*tion of Marion's Warranty Deed to her purchasers to accomplish this purpose."* (Emphasis in original.) The defendants draw the conclusion that, in light of the fact that Marion was conveying Lot 3 out of the immediate family in 1953, Stuart's deed to Marion did not reaffirm or reinforce his permanent easement but, in fact, operated to reduce it to a personal easement for his (Stuart's) lifetime.

We cannot accept the argument of the defendants. It is true that if the only intent were to continue Stuart's permanent easement across Lot 3 after its sale, no additional deed would have been necessary to accomplish this. It is precisely this fact, however, which leads us to conclude, along with the "surrounding circumstances," that more than that was intended and accomplished by this 1953 deed. Notwithstanding the defendants' argument, it is a fair inference that the purpose of this transaction between brother and sister must have been to purge Stuart of any interest he may have had in Lot 3 in order to allow Marion to pass a clear title to her purchaser in this first out-of-the-family transfer involving these lots. Viewed in this light, it made perfect sense for Stuart to include the reservation clause in the 1953 deed not merely to affirm his permanent easement but, more significantly, to avoid extinguishing or releasing the permanent easement. See *Richardson* v. *Tumbridge,* 111 Conn. 90, 93, 149 A. 241 (1930); *Stueck* v. *Murphy Co.,* 107 Conn. 656, 662, 142 A. 301 (1928); *Mitchell* v. *Leavitt,* 30 Conn. 587 (1862); *Westlake* v. *Silva,* 49 Cal. App. 2d 476, 121 P.2d 872 (1942); *LaPlant* v. *Schuman,* 197 Iowa 466, 196 N.W. 280 (1923); *Midella Enterprises, Inc.* v. *Missouri State Highway Commission,* 570 S.W.2d 298, 300 (Mo. Ct. App. 1978). Therefore, it cannot be said that

the intention behind the 1953 deed from Stuart to Marion was to transform the permanent easement into an easement in gross.

This court has noted that the existence of surrounding circumstances will further negate the presumption of an easement in gross in the absence of words of limitation in the conveyance. See *Brown* v. *Connecticut Light & Power Co.,* 145 Conn. 290, 298, 141 A.2d 634 (1958) ; *Birdsey* v. *Kosienski,* supra, 410; *Taylor* v. *Dennehy,* supra, 403; *Blanchard* v. *Maxson,* 84 Conn. 429, 433, 80 A. 206 (1911) ("An easement of way will never be presumed to be personal when it can fairly be construed to be appurtenant to land.") ; *New Haven* v. *Hotchkiss,* 77 Conn. 168, 175, 58 A. 753 (1904). " 'One circumstance which must be given great weight in the ascertainment of the intent of the parties is that the easement is of value to the dominant tenement itself. If it is of value to the property to which it is appurtenant and will continue to be of value whoever may own the property, that is strong evidence that the parties intended a permanent easement.' *Birdsey* v. *Kosienski,* [140 Conn. 403, 410–11, 101 A.2d 274 (1953)]." *Leabo* v. *Leninski,* 182 Conn. 611, 614–15, 438 A.2d 1153 (1981). The trial court expressly found that "the easement to the water greatly enhances the value of plaintiffs' property since it gives the plaintiffs access to the waters of Long Island Sound." See *Dunn Bros., Inc.* v. *Lesnewsky,* 164 Conn. 331, 335, 321 A.2d 453 (1973).

The defendants claim that this conclusion is erroneous because there was no testimony, expert or otherwise, as to the value of the plaintiffs' property with and without the Long Island Sound easement.

The record indicates, however, that the plaintiffs have no direct access to Long Island Sound without the easement and that one of the plaintiffs testified that not only did the easement have value, but that they would not have bought the property without it. This evidence, coupled with the court's own general knowledge of property values as well as its view of the property involved, was sufficient to establish that the easement was of value to the property to which it is appurtenant. See *Leabo* v. *Leninski,* supra, 614–15; *Dunn Bros., Inc.* v. *Lesnewsky,* supra, 335; *Blanchard* v. *Maxson,* supra, 433.

In *Blanchard* v. *Maxson,* supra, 433, we stated that among the "surrounding circumstances" to be considered "are the relation or want of relation of the rights of way to the estate of the person to whom the grant is made, or to the other estate of the person by whom they are reserved or excepted, and the necessity they will meet or the benefit they will contribute in the enjoyment of such estate by its owner." The benefit of the reservation to Stuart's property is "apparent." See *Birdsey* v. *Kosienski,* supra, 411.

"Also significant is whether the owner of the servient estate recognized the right of the subsequent owners of the dominant estate to exercise the easement. *Birdsey* v. *Kosienski,* supra, 411." *Leabo* v. *Leninski,* supra, 615; see *Dunn Bros., Inc.* v. *Lesnewsky,* supra. Relevant to this point is the trial court's observation that "[t]he testimony herein indicated that every deed in the chain of title from Marion McKenzie [sic] until the present indicates that the property was subject to the aforementioned right of way, including the mortgage deed executed by the defendants at the time

of their purchase." There was also testimony demonstrating that at least one of the defendants knew, before the property was purchased, that people, including the plaintiffs, used the Long Island Sound easement to gain access to the beach area. Florence Carberry, the sister of one of the plaintiffs, testified that she had used the easement for nineteen years without anyone preventing her from doing so. The defendants have countered this evidence with testimony of a predecessor in title of Lot 3 from 1970 to 1973, Charles Bennett Norman, in which he stated that, on two separate occasions during his ownership, he prevented Florence Carberry from using the Long Island Sound easement. However, merely two interruptions during the nineteen year period of the plaintiffs' use of the easement is not sufficient to overcome the significance of the recognition by the servient estates' predecessors in title, as well as those of the defendants themselves, both in their deeds and in their actions; see *Leabo* v. *Leninski,* supra, 615; *Dunn Bros., Inc.* v. *Lesnewsky,* supra, 335–36; *Birdsey* v. *Kosienski,* supra, 411–12; of the plaintiffs' right to use the Long Island Sound easement.

Finally, we will look to the actual language of the reservation clause itself. See *Dunn Bros., Inc.* v. *Lesnewsky,* supra, 336. This reservation clause provides additional support for the conclusion that Stuart retained an appurtenant easement and not merely an easement in gross. The critical language provides "reserving, however, to me . . . as appurtenant to my other land . . . a right of way and easement." In a similar case, we held that an easement reserved "for and as an appurtenance to the other land of the grantors" was permanent and

ran with the land.[5]   See *Dunn Bros., Inc.* v. *Les-newsky,* supra.   "By definition, an appurtenant easement runs with the land rather than with any particular owner."   Id.   We have no difficulty in affirming the trial court's holding that Stuart intended and actually reserved an appurtenant easement running with land for the benefit of the owners of Lots 1 and 2.

We next address the defendants' claim that the trial court erred in awarding $500 to the plaintiffs for damages sustained to the Long Island Sound easement.   "The law is settled that the obligation of the owner of the servient estate, as regards an easement, is not to maintain it, but to refrain from doing or suffering something to be done which results in an impairment of it.   2 Thompson, Real Property (Perm. Ed.) § 675."   *Carrig* v. *Andrews,* 127 Conn. 403, 407–408, 17 A.2d 520 (1941); see 2 Thompson, Real Property (1961 Replacement) §§ 428, 429; 3 Tiffany, Real Property (3d Ed. 1939) § 811; 25 Am. Jur. 2d, Easements and Licenses §§ 85, 89.   The trial court found that the defendants' drainage pipes which diverted the surface water to flow from their property onto the Long Island Sound easement constituted an impairment of the plaintiffs' use of the easement and awarded "$500 to cover the cost of the damages sustained in the easement."   "Some damage neces-

[5] For other cases in which an easement was held to be appurtenant despite the absence of the "heirs and assigns" language, see *Zavisza* v. *Hastings,* 143 Conn. 40, 46, 118 A.2d 902 (1955); *Birdsey* v. *Kosienski,* 140 Conn. 403, 411–12, 101 A.2d 274 (1953); *Carlson* v. *Libby,* 137 Conn. 362, 367–68, 77 A.2d 332 (1950); *Whittelsey* v. *Porter,* 82 Conn. 95, 101, 72 A. 593 (1909); *Knowlton* v. *New York, N.H. & H. R. Co.,* 72 Conn. 188, 193, 44 A. 8 (1899); *Chappell* v. *New York, N.H. & H. R. Co.,* 62 Conn. 195, 207, 24 A. 997 (1892); *Randall* v. *Latham,* 36 Conn. 48, 53 (1869); but see *Taylor* v. *Dennehy,* 136 Conn. 398, 403, 71 A.2d 596 (1950).

sarily follows any wrongful invasion of another's property. *Nicholson* v. *New York & N.H. R. Co.,* 22 Conn. 74, 84 [1852]; *Parker* v. *Griswold,* 17 Conn. 288, 302 [1845]. 'This necessary damage is actual as distinguished from the mere nominal damage involved . . . in some casual and inoffensive tort; . . . but it is nominal as distinguished from any specific damage suffered and proved. In a case like this some damage results from the mere invasion of the plaintiff's rights, and its amount, not being determinable by proof, must be comparatively small and in that sense nominal.' *Watson* v. *New Milford Water Co.,* 71 Conn. 442, 450, 42 A. 265 [1899]; *Dewire* v. *Hanley,* 79 Conn. 454, 458, 65 A. 573 [1907]." *Patalano* v. *Chabot,* 139 Conn. 356, 362, 94 A.2d 15 (1952); see *Dimmock* v. *New London,* 157 Conn. 9, 16, 245 A.2d 569 (1968). "To sustain an award of substantial damages requires a showing of an actual, as opposed to a mere technical injury. *Hageman* v. *Freeburg,* 115 Conn. 469, 472, 162 A. 21 (1932); *Beattie* v. *New York, N.H. & H. R. Co.,* 84 Conn. 555, 559, 80 A. 709 (1911)." *Mackin* v. *Mackin,* 186 Conn. 185, 190, 439 A.2d 1086 (1982).

There was evidence before the court, in the form of testimony by Philip Cippri, an experienced landscaper and tree trimmer, that in order to repair the easement, it would be necessary to expend $2500 for the installation of an asphalt stairway extending the length of the easement. The court was of the view that "[w]hile the plaintiffs are entitled to make repairs to the easement consistent with its intended use, the expenditure of such a sum would not be." Outside of this testimony, however, there was no other evidence which would support a conclusion as to the amount of the damages sustained.

The record discloses that the plaintiffs failed to prove any amount of damage as to the diminution in value of their property;[6] see *Buckley* v. *Maxson,* 120 Conn. 511, 519, 181 A.2d 922 (1935); or as to the cost of repairs to return the easement to its original state; see *Center Drive-In Theatre, Inc.* v. *Derby,* 166 Conn. 460, 467–68, 352 A.2d 304 (1974); or as to the difference in the value of the easement just before the interference and the value immediately after the obstruction was completed. See generally *System Fuels, Inc.* v. *Barnes,* 363 So. 2d 747, 749 (Miss. 1978); 28 C.J.S., Easements § 114 (a). This being the case, the plaintiffs were entitled to no more than nominal damages. See *Mackin* v. *Mackin,* supra, 190–91.

## II

We now turn to the issues raised by the plaintiffs' cross appeal. The plaintiffs first argue that the trial court erred in finding that there was no interference with the plaintiffs' use of the Long Island Sound easement even though the defendants' fence encroached upon that easement. The plaintiffs claim that the court should have ordered the removal of the fence because it constituted a nuisance.

"The owner of the servient estate may erect fences along the sides of a way, provided the right of passage is not thereby obstructed." (Footnotes omitted.)  28 C.J.S., Easements § 98 (a); see *Dolske* v. *Gormley,* 58 Cal. 2d 513, 520, 375 P.2d 174 (1962); *Juban Properties, Inc.* v. *Claitor,* 354

---

[6] Philip Cippri testified that the easement basically consists of approximately forty-eight flat stones laid out to form a stairway to the beach. He stated that an alternative to repairing by adding asphalt would be to reset the stone steps, but he could not estimate the time or cost to do so.

So. 2d 672, 675 (La. App. 1978); *Davis* v. *Winsor,* 165 Pa. Super. 212, 213, 67 A.2d 569 (1949). Our quotation from *Carrig* v. *Andrews,* 127 Conn. 403, 407–408, 17 A.2d 520 (1941), is equally applicable here. In an early case, this court held that a fence, erected within the boundaries of an easement so as to constitute a nuisance, was abatable "if it *materially* interfered with [the] reasonable enjoyment of the easement, or rendered that enjoyment less beneficial or convenient than before its erection." (Emphasis added.) *Blanchard* v. *Maxson,* 84 Conn. 429, 436, 80 A. 206 (1911). "The owner of land over which an easement has been granted has, by law, all the rights and benefits of ownership consistent with the existence of the easement. *American Brass Co.* v. *Serra,* 104 Conn. 139, 150, 132 A. 565 [1926]; 28 C.J.S., Easements, § 91 . . . . Of necessity, the interests of the owner of the easement often conflict with the interests of the owner of the burdened estate. By law, however, each of the parties owes certain duties to the other." *Center Drive-In Theatre, Inc.* v. *Derby,* supra, 464; see also Restatement, Property § 486.

In the present case, the court found, after viewing the premises, that the fence "slightly" encroached on the easement but that it did not interfere with the use of the easement by the owners of the dominant estate. The evidence disclosed that the fence did encroach on the boundary line of the Long Island Sound easement by 0.6 feet or 7¼ inches. It is important to note, however, that the sole purpose of this easement was to provide the owners of Lots 1 and 2 with a means by which they could walk to the beach. We cannot say, after viewing the photographs included as exhibits and in light of the use of the easement,

that the fence materially or substantially interferes with pedestrian passage over the easement.[7] This was a question of fact for the trial court whose decision we will not set aside unless clearly erroneous. See Practice Book § 3060D; *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 220–22, 435 A.2d 24 (1980).

The second argument which the plaintiffs present concerns the defendants' parking space located within the plaintiffs' 29.58 foot strip of land designated as the "right of way." The plaintiffs claim that the trial court erred in ordering them to remove the cement blocks which they placed along the perimeter of the defendants' parking space. The trial court found that these cement blocks interfered with the defendants' means of ingress and egress from their vehicles. The plaintiffs have not presented us with any compelling reason to overturn this decision of the trial court.

The plaintiffs claim that their purpose in placing the cement blocks along the perimeter of the parking space was to delineate the space and to prevent the defendants from encroaching upon the plaintiffs' land, presumably by swinging open the doors of the defendants' automobile. The plaintiffs also claim that the cement blocks do not interfere with the defendants' use of the easement.

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are sup-

---

[7] Had the purpose of the Long Island Sound easement been to provide for automobile or other means of travel to the beach area, this 7¼ inch encroachment might very well materially or substantially interfere with its reasonable enjoyment.

ported by the evidence or whether, in light of the evidence and the pleadings in the whole record, [the finding of] those facts [is] clearly erroneous." (Footnote omitted.) *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 221–22. Upon reviewing the record before us, we cannot say that the trial court's findings were clearly erroneous. There was testimony that the concrete blocks did interfere with the defendants' use of their parking space which the trial court had an opportunity to view. " 'We have consistently held that the visual observations made by the trier on a visit to the property are as much evidence as the evidence presented for his consideration by the witnesses under oath.' *Houston* v. *Highway Commissioner,* 152 Conn. 557, 558, 210 A.2d 176 (1965); see *D'Addario* v. *Commissioner of Transportation,* 180 Conn. 355, 366, 429 A.2d 890 (1980); *Birnbaum* v. *Ives,* [163 Conn. 12, 20, 301 A.2d 262 (1972)]; *Gentile* v. *Ives,* 159 Conn. 443, 452, 270 A.2d 680 (1970), cert. denied, 400 U.S. 1008, 91 S. Ct. 566, 27 L. Ed. 2d 621 (1971). . . ." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 220.

Many of the same considerations discussed above with respect to the fence also apply to the parking space issue. In the defendants' deed to the parking space, they were also granted "a right of way in common with others to and from said [parking space] to and from Ocean Drive East over and across [the 29.58 foot right of way]." In light of the purpose and use of this right of way, the trial court could reasonably have found that the plaintiffs' actions materially or substantially interfered with the defendants' use of the right of way. See *Toms* v. *Settipane,* 30 Conn. Sup. 374, 383, 317 A.2d 467 (1973).

Finally, the plaintiffs claim that the trial court should have expressly stated that the defendants could not exclude the plaintiffs from the beach area between the mean high water and mean low water marks. Evidently, this matter was raised at trial because the pleadings do not raise this as an issue. The trial court, however, stated that there "can be no dispute" as to the plaintiffs' right to use this beach area. The defendants, in their brief, do not claim any exclusive right to use this beach area. We can find nothing wrong with the trial court's statement of the law. See *Leabo* v. *Leninski,* 182 Conn. 611, 617–18, 438 A.2d 1153 (1981); *State* v. *Knowles-Lombard Co.,* 122 Conn. 263, 265, 188 A. 275 (1936). No other issue concerning the use of the beach area is before us.

There is error in part, the judgment with respect to damages is set aside and the case is remanded with direction to render a judgment for the plaintiffs for $1 damages. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

## Appendix